## A08A1263. LUMPKIN v. DEVENTER NORTH AMERICA, INC. et al.

(672 SE2d 405)

PHIPPS, Judge.

Deventer North America, Inc. (Deventer) and Julia Lumpkin entered into a contract for Lumpkin's purchase of a house being renovated by Deventer. Before the house was finished, however, Lumpkin ordered Deventer to stop work and contracted with someone else to complete construction. Deventer later invoiced Lumpkin for work performed, but Lumpkin refused to pay.

Deventer then brought this suit charging Lumpkin with, among other things, breach of contract and fraud. Lumpkin, in turn, filed a counterclaim charging Deventer and its owner, Wesley Godwin, with breach of contract and fraud. Both Deventer and Lumpkin also sought attorney fees based on allegations of bad faith in their dealings with one another. Finding no evidence of fraud by either Lumpkin, Deventer or Godwin, the trial court directed a verdict against both Lumpkin and Deventer on their fraud claims, even though neither Deventer nor Godwin had moved for a directed verdict on Lumpkin's claim of fraud. The jury returned a verdict awarding Deventer $170,000 on its breach of contract claim and $128,182.47 on its attorney fee claim and awarding Lumpkin nothing on her counterclaim. After the court's entry of judgment on the verdict, Lumpkin moved for a judgment notwithstanding the verdict or for a new trial on her claim of fraud against Deventer and Godwin. Following the court's denial of those post-trial motions, Lumpkin filed a notice of appeal from the judgment entered against her in favor of both Deventer and Godwin. For reasons that follow, we find that the trial court erred in directing a verdict in favor of Deventer and Godwin on Lumpkin's fraud claim and, therefore, reverse.

Evidence introduced at trial showed that after Deventer had acquired the residential property and begun to renovate it, Lumpkin came to the construction site, met with Godwin, and expressed an interest in purchasing the house. Godwin told Lumpkin that the house, as renovated in accordance with existing construction drawings and specifications, would cost $1.1 million, but that any major changes or alterations would have to be "priced out," i.e., would increase the price. Godwin and Lumpkin verbally agreed that she would disburse about $250,000 to help defray expenses for certain aspects of the renovation of the house and that she would thereby acquire an option either to buy the house or, upon sale of the house to someone else, be reimbursed for the funds she had provided. Throughout the construction process, Lumpkin dealt with Godwin or with Deventer's project supervisor, Eric Busbee. Undisputably, Lumpkin requested a number of major changes and alterations to

the original plans.

Lumpkin testified that she disbursed monies to Deventer between July and November 2001, during which time there was a flurry of construction activity, but that afterward, through no fault of her own, construction work came to a virtual standstill. As a result, she asked Randy Lomax, a friend of hers and an attorney, to contact Godwin.

Although Lumpkin had concerns about numerous construction defects such as roof leaks that would require repairs, she and Deventer entered into a written contract dated December 31, 2001, with special stipulations for Deventer's sale of the house to her. The contract reflected a sales price of $1,440,000, which included over $250,000 already paid by Lumpkin to contractors, about $680,000 to pay off a first mortgage on the property, and $365,849 due to Deventer upon completion. Special stipulations required Deventer to complete construction of the residence and obtain a certificate of occupancy on or before March 15, 2002. Lumpkin was also required to disburse over $100,000 to subcontractors and materialmen before construction was completed. Because of Lumpkin's concerns about construction defects, one of the special stipulations provided for a pre-closing walk-through of the property by the parties. Lumpkin testified that she agreed to purchase the house despite her concerns because of assurances by Godwin that the defects would be cured.

On February 5, 2002, however, Godwin wrote Lomax a letter declaring the contractually-agreed completion date, that had been extended from March 15 until March 19 due to inclement weather, invalidated by Deventer's inability to obtain a certificate of occupancy due to Lumpkin's failure to respond, communicate, or make necessary decisions. At or about that time, Godwin also sent Lomax a list of outstanding balances totaling about $176,000 owed by Lumpkin to Deventer on various accounts of subcontractors, suppliers, and employees.

Lumpkin testified that shortly thereafter, she went to the house during a heavy rain and observed water gushing into the kitchen and damaging sheet rock. According to Lumpkin, Busbee met her at the house and informed her that they were not going to make any repairs. At that point, she decided to have another contractor, Phillip Carter, inspect the house. Therefore, on February 13, Lomax instructed Godwin to stop work temporarily. By faxes, Godwin responded to Lomax that, as a result of the stop-work order, Deventer would not be able to fulfill financial obligations to laborers, suppliers, and subcontractors; that additional, resultant costs would be charged to Lumpkin; and that the building permit that had been issued to him should be reissued to Lumpkin because laborers and subcontractors hired by her were assuming control of the project. On

February 22, Godwin sent Lomax an invoice for $196,500 for work completed as of that date.

Carter, who Lumpkin hired to inspect the house, testified that "we didn't know what all we were going to find [until] we tore things out." A roofing contractor who inspected the roof at Carter's request testified to numerous construction defects requiring removal and replacement of the roof. A structural engineer testified that reinforcement of the top floor was required to avert a possible extreme catastrophic failure of the floor. Another contractor testified that due to various inadequacies, the entire heating and air conditioning systems had to be replaced. Other contractors testified to other construction defects requiring numerous repairs. Lumpkin claims that she spent about $650,000 to complete construction, which included about $350,000 to repair defects.

1. Lumpkin contends that the trial court erred in sua sponte directing a verdict in favor of Deventer and Godwin on her claim of fraud.

To support her claim of fraud, Lumpkin was generally required to show: "(1) a false representation or concealment of material fact; (2) scienter; (3) intent to induce the allegedly defrauded party to act or refrain from acting; (4) justifiable reliance; and (5) damages."[1]

> The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise, any breach of a contract would amount to fraud. An exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place.[2]

"A promise made without a present intent to perform is a misrepresentation of a material fact and is sufficient to support a cause of action for fraud."[3]

Moreover,

> fraud in the sale of real estate may be predicated upon a wilful misrepresentation, i.e., the seller tells a lie; upon active concealment where the seller does not discuss the

---

[1] *Young v. Oak Leaf Builders*, 277 Ga. App. 274, 278 (3) (626 SE2d 240) (2006) (footnote omitted).

[2] *Buckley v. Turner Heritage Homes*, 248 Ga. App. 793, 795 (3) (547 SE2d 373) (2001) (punctuation and footnote omitted).

[3] *Rogers v. DeMonteguin*, 193 Ga. App. 480, 482 (1) (388 SE2d 10) (1989) (citation and punctuation omitted).

defect but takes steps to prevent its discovery by the purchaser; and thirdly a passive concealment where the seller does nothing to prevent the discovery but simply keeps quiet about a defect which though not readily discernible, is known to the seller.[4]

As to matters of proof, "[f]raud may not be presumed but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence."[5] Moreover, whether a person charged with fraud intended not to perform promises at the time they were made is generally not susceptible to proof by direct evidence and so is proven by inference from other evidence.[6] Therefore, circumstances, almost inconclusive if separately considered, may by their number and joint operation be sufficient to constitute proof.[7] If, however, evidence as to any of the elements of fraud is lacking, the fraud claim fails.[8] "A directed verdict is authorized only when 'there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict.' "[9]

Lumpkin charges Godwin with fraudulently inducing her to proceed with closing by falsely representing during the walk-through that the roof leaks would be repaired and other problems remedied. In support of her claim that Godwin had no intention to correct these problems, Lumpkin relies on testimony by Roger Joiner, the sheet rock subcontractor on the project. Joiner testified that although he had installed the sheet rock properly, he returned to the house to find ceiling leaks causing water damage. Joiner further testified that he told Godwin that the sheet rock needed to be removed because there was an underlying plumbing or roofing problem, but that Godwin refused to do so and told Joiner to "dress it up the best you can" and that if necessary he would remove the sheet rock later and "back charge" Lumpkin (i.e., impose an additional charge) for it. Joinder viewed that as "kind of dishonest." We view that as evidence from which the jury could have found that, in the course of performing the parties' contract, Godwin, on behalf of Deventer, made promises he

---

[4] *Fincher v. Bergeron*, 193 Ga. App. 256, 258 (1) (a) (387 SE2d 371) (1989) (citations and punctuation omitted).

[5] OCGA § 23-2-57.

[6] See *Hayes v. Hallmark Apts.*, 232 Ga. 307, 309 (1) (207 SE2d 197) (1974).

[7] *Kelly v. Cubbedge*, 143 Ga. App. 830, 831 (240 SE2d 162) (1977).

[8] *Young*, supra.

[9] *Carden v. Burckhalter*, 214 Ga. App. 487, 488 (1) (b) (448 SE2d 251) (1994), citing OCGA § 9-11-50 (a).

did not intend to keep.[10] The jury could also have found that at least some of the numerous repairs Lumpkin made to the house after she had discharged Deventer were to correct defects passively concealed by Deventer and not reasonably discernible by her. For these reasons alone, the trial court erred in sua sponte directing a verdict in favor of Deventer and Godwin on Lumpkin's fraud claim.

2. The remaining enumerations of error are moot because they all relate to evidentiary rulings of the trial court that were based on ambiguous provisions in the pre-trial order, and these ambiguities should and presumably will be clarified before any retrial.

As to the remaining issues, we nonetheless note for purposes of clarification on retrial: (a) Testimony by Joiner, that Busbee told him to "increase his bid because Lumpkin was loaded," would not constitute inadmissible hearsay, because it was being admitted for the purpose of showing the fact that the statement was made rather than the truth of the matters asserted therein,[11] and such testimony certainly would be a circumstance relevant to Lumpkin's fraud claim. (b) Testimony by Lumpkin that Busbee had met her at the house during the heavy rain in February 2002 and told her that Deventer would not repair leaks in the house, was admissible for the non-hearsay purpose of explaining Lumpkin's conduct in discharging Deventer[12] and under the exception to the hearsay rule applicable to admissions by an agent.[13] (c) Although an attorney cannot recover for professional services without proof of their value,[14] the attorney herself is competent to testify as to her opinion on reasonable fees,[15] and Deventer's attorney did testify at trial and by affidavit that her itemized attorney fee bill was reasonable and necessary.[16]

*Judgment reversed. Johnson, P. J., Blackburn, P. J., Smith, P. J., and Miller and Ellington, JJ., concur. Barnes, C. J., concurs in part and dissents in part.*

BARNES, Chief Judge, concurring in part and dissenting in part.

Because the trial court properly granted a directed verdict to the contractor on the home buyer's counterclaim for fraud in this construction case, I must respectfully dissent from the majority

---

[10] See *Young*, supra.

[11] See *North Carolina v. Mitchell*, 522 SE2d 94 (N.C. App. 1999).

[12] See *Powell v. Alan Young Homes, Inc.*, 251 Ga. App. 72, 74 (1) (554 SE2d 186) (2001).

[13] See *Hodges v. Putzel Electric Contractors*, 260 Ga. App. 590, 596 (3) (580 SE2d 243) (2003); OCGA § 24-3-33.

[14] *Price v. Mitchell*, 154 Ga. App. 523, 526 (6) (268 SE2d 743) (1980).

[15] *Altamaha Convalescent Center v. Godwin*, 137 Ga. App. 394, 397 (3) (224 SE2d 76) (1976).

[16] See *Campbell v. Bausch*, 195 Ga. App. 791, 792 (2) (b) (395 SE2d 267) (1990); compare *Hardnett v. Ogundele*, 291 Ga. App. 241, 244 (2) (661 SE2d 627) (2008).

opinion.[17] I agree, however, that the evidence supported the award of attorney fees to the contractor.

1. The focus of the buyer's fraud claim was her contention that she bought the house based on the contractor's pre-closing assurance that he would fix certain problems, and that he made those promises without intending to fulfill them. But the record shows that the December 31, 2000 sales contract gave the contractor until March 15, 2001 to finish the construction, and the evidence is undisputed that the buyer made the contractor stop working a month before the completion date, although the parties dispute why the buyer made him stop. The property had been inspected numerous times before and after then — no fewer than eight inspectors testified for the contractor — and after the buyer dismissed him, the house sat for more than a year before anyone worked on it. One of the buyer's contractors testified that no one worked on the house from February 2002 to at least December 2003, when he inspected it, and the new general contractor testified that he did not obtain an initial inspection of his work until February 2004.

Although "[a] promise made without a present intent to perform is a misrepresentation of a material fact sufficient to support an action for fraud [cit.]," *Community Fed. Sav. &c. v. Foster Developers, Inc.*, 179 Ga. App. 861, 864 (1) (348 SE2d 326) (1986), "[a] builder may negligently construct a house or be in breach of his contract or of warranty and yet be free of the moral guilt of fraud." *Lively v. Garnick*, 160 Ga. App. 591, 594 (1) (287 SE2d 553) (1981).

The buyer's expert testified he found numerous construction errors which required extensive revisions, but he also testified that he changed many things because he did not like the esthetics. A subcontractor testified for the buyer that the contractor told him to cover up a problem two months before he sold the house, and the buyer argues this testimony is evidence that the contractor never intended to keep his promise to finish the house. But the contractor owned the property at the time, had no sales contract with the buyer, and sold the unfinished house for a fixed price, so he could not charge the buyer extra money to fix anything.

Further, the buyer did not testify that the contractor's supervisor said the contractor would not make any repairs when she talked to him during a rainstorm in February 2002, but that she thought the repairs suggested were inadequate. Finally, the contractor's expert testified that many of the areas that needed fixing were

---

[17] The trial court also granted summary judgment to the buyer on the contractor's fraud claim, which the contractor has not appealed. This case went to the jury on the parties' competing breach of contract claims, and the jury found for the contractor, awarding him $170,000 damages and $128,182 attorney fees.

constructed properly, but had suffered damage because they had not been finished and were exposed to the elements for more than 13 months. For example, paint peeled because it had only been primed and not painted; water leaked through the doors and windows because they had not been finally set, caulked, or trimmed out; and wood rotted because finishes had not been applied. In his opinion, other problems, such as a path that did not drain properly, uneven concrete, or trim that did not meet squarely, could have easily been fixed if the contractor had been allowed to remain on the job for another month.

> The evidence in the instant case reveals that in spite of the fact that the house had not been completed, the [buyer was] at least as anxious as [the contractor] to close the sale. All parties agreed that [$365,000] would not be disbursed to [the contractor] until the house was completed in accordance with the special stipulations of the contract. . . . If the evidence shows anything, it shows a mere breach of contract. There is no evidence that [the contractor] did not intend to comply with the terms of the special stipulations at the time the promises were made at the closing.

*Lively v. Garnick*, supra, 160 Ga. App. at 596 (3).

Certainly the buyer had a valid breach of contract action, which the jury heard and resolved against her. But after 14 days of trial and 26 witnesses, some of whom testified more than once, the evidence does not raise a genuine issue of material fact concerning whether the contractor induced the buyer to close by making a promise he never intended to keep.

2. As to the evidentiary issues raised by the buyer, I disagree that the trial court should have admitted certain hearsay statements.

(a) The buyer contends that the trial court erred in excluding as hearsay a subcontractor's testimony that the supervisor told him to increase his bid because the buyer "was loaded." While some statements are admissible to show that the statements were made and not for the truth of the statements, in this case, the truth of the statement — whether the supervisor told the subcontractor to pad his bill — *was* the issue, and thus the trial court properly excluded it.

(b) Regardless of whether the trial court erred in disallowing some of the buyer's testimony that the supervisor told her after the closing that the contractor would not fix the roof, the buyer was allowed to testify that the repairs offered were insufficient.

(c) Finally, I agree with the majority that the trial court properly denied the buyer's motion for a directed verdict on the contractor's claim for attorney fees.

Accordingly, I respectfully concur in part and dissent in part from the majority opinion.

DECIDED NOVEMBER 26, 2008 —
RECONSIDERATION DENIED DECEMBER 16, 2008 — 

*Richard A. Childs*, for appellant.
*Tina M. Richards*, for appellees.

